UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
EDDIE BETANCOURT,

      Petitioner,

  -against-

FRANK TRACY, Superintendent,

      Respondent.
-----------------------------------------------------------X

NOT FOR PUBLICATION

MEMORANDUM & ORDER

CV 03-1747 (CBA)

AMON, UNITED STATES DISTRICT JUDGE:

## INTRODUCTION

Petitioner Eddie Betancourt, proceeding pro se, seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. He claims that: (1) the prosecution failed to disclose certain exculpatory evidence as required under Brady; (2) his guilt was not proved beyond a reasonable doubt; and (3) errors in the trial court's charge to the jury deprived him of a fair trial. For the reasons set forth below, the petition is denied.

## BACKGROUND

I.  The Evidence at Trial

 A.  The People's Case

In 1995, at the age of 18, Julio Jiminez, the victim, moved to New York from Puerto Rico and lived with his grandmother on DeKalb Avenue in Brooklyn. Soon thereafter, Jiminez became good friends with Betancourt, who also lived on DeKalb Avenue. (Jiminez: 520.)[1] Jiminez also became friendly with Ricardo Gonzalez and Roberto Rosario (Jiminez: 522.)[2]

---

[1] References to the trial transcript will be indicated by the last name of person testifying, where appropriate, and with the indication "Tr." elsewhere.

[2] Gonzales testified pursuant to a cooperation agreement. He was charged with attempted murder in this case, but the District Attorney's Office had agreed to defer the presentation of his

Gonzalez and Betancourt were "almost brothers," according to Gonzalez. (Gonzalez: 639.) Betancourt, Jiminez, and Gonzalez were members of a group that hung out on DeKalb Avenue, but Rosario was not a member. (Jiminez: 524.) Betancourt was the leader of the group (Jiminez: 524.) Betancourt was also friendly with a man called Darnell Smith, who spent a lot time on DeKalb Avenue. (Jiminez: 521-22.)

On Friday, October 23, 1998, Jiminez returned home from work at approximately 7:00 p.m. (Jiminez: 524-25.) At approximately 10:30 p.m., Jiminez went out onto DeKalb Avenue where Betancourt, Gonzalez, Rosario, Smith and some other people Jiminez knew were drinking (Jiminez: 525-27, 565-67; Gonzalez: 640-41.)

Jiminez had two drinks and two "puffs" of marijuana (Jiminez: 567.) At approximately 11:30 p.m., Jiminez got in a car with Gonzalez, Betancourt, Smith, and Rosario. (Jiminez: 527.) Jiminez accepted the ride without asking where the group was heading. (Jiminez: 527.) Rosario was driving and Gonzales was in the front passenger seat. (Jiminez: 528, 573.) Jiminez, sitting on the left in the back seat, dozed off for a few minutes. (Jiminez: 527, 573-74.) When he awoke they were near a bridge, and Rosario brought the car to a stop on Front Street. (Jiminez: 528, 570-71, 573-74; Gonzalez: 642-45.)

Gonzalez got out of the car and asked Jiminez to step out too. (Jiminez: 528-29.) Gonzalez said that he had a problem which Jiminez did not know about. (Jiminez: 573-79.) Smith had also gotten out of the car and stood next to Gonzalez, cursing at Jiminez. (Jiminez: 579-80.) Jiminez gave Smith a push. (Jiminez: 529.) In response, Smith pulled out a knife and swung it at Jiminez. (Jiminez: 529.) Jiminez jumped back, away from Smith, and someone

---

case to the Grand Jury in exchange for his testimony. If Gonzalez failed to testify truthfully, then the District Attorney's Office could seek to indict him. (Gonzalez: 638; Stipulation: 710.)

stabbed him in the back. (Jiminez: 529.) Jiminez turned around to see who stabbed him and saw Betancourt "right in [his] face," less than two feet away. (Jiminez: 530.) Betancourt was concealing something in his right hand. (Jiminez: 538.) Jiminez never saw a knife in Betancourt's hand and did not see Betancourt actually stab him. (Jiminez: 587-88.) Gonzalez saw Betancourt get out of the car, come up behind Jiminez, and stab him in the upper back area with his right hand. (Gonzalez: 646-47.)[3]

Jiminez asked Betancourt why he stabbed him and Betancourt did not respond (Jiminez: 531.) Jiminez turned back around and Smith stabbed him in the stomach. (Jiminez: 530.) As the attack was occurring, Gonzalez was standing about ten feet from Smith. (Gonzalez: 647.) Jiminez then started to run toward Hudson Avenue. (Jiminez: 531, 539; Gonzalez: 649.)[4]

After reaching Hudson Avenue, he started banging on doors begging for help. (Jiminez: 539.) Then, covered in blood, he lay down on the ground, believing he was going to die. (Jiminez: 539-40.)

Someone approached Jiminez, who closed his eyes and pretended he was dead. Jiminez heard Betancourt say, "I think he's dead. Let's go, let's go." (Jiminez: 540.) After that Rosario

---

[3] According to Gonzalez, the first person to stab Jiminez was Smith, not Betancourt (Gonzalez: 647).

[4] Rosario remained in the car throughout the attack. (Jiminez: 546, 582-84; Gonzalez: 650.) According to Gonzalez, when the attack began, Rosario called Gonzalez back to the car and Gonzalez obeyed. (Gonzalez: 645-46, 649.) Gonzalez testified that once he got back into Rosario's car, the two of them drove off (Gonzalez: 651, 663.) This testimony conflicts with that of Greland, who testified that Betancourt got back in the car with Gonzalez and Rosario. (Greland: 677.) Ortiz, who testified outside of the presence of the jury, said that Betancourt was in the car with Gonzalez and Rosario when they got back. (Tr. 701.)

drove off, and Jiminez heard a voice asking if he needed help (Jiminez 542; Greland: 677.)[5]

Sergeant Stephen Isola responded to a radio communication and went to Hudson Avenue between Front and Water Streets. (Isola: 429-31.) He found Jiminez, covered in blood, breathing faintly, lying on the sidewalk in front of 67 Hudson Avenue, with a trail of blood starting at 75 Hudson Avenue. (Isola: 431-32.) Isola radioed for medical assistance, and Jiminez was taken to Bellevue Hospital. (Jiminez: 552.) Before the ambulance arrived, Isola asked Jiminez if he knew who had attacked him. (Jiminez: 590.) Although Jiminez in fact did know who attacked him, he said he did not. (Jiminez: 590.) Jiminez thought he was dying and lied to Isola in order to insure that he was taken to the hospital quickly rather than be held at the scene for questioning. (Jiminez: 601, 605.)

Jiminez was taken to Bellevue Hospital and at 1:00 a.m. on October 24 was examined by Dr. Ari Brooks. (Brooks: 617-18.) Jiminez was awake, but lethargic. (Brooks: 618.) He had two stab wounds to the abdomen, two wounds on the side of his chest, and five wounds to the back. (Brooks: 619.) His blood pressure was low, he was bleeding heavily, and Brooks deemed Jiminez in critical condition. (Brooks: 621, 627.) Brooks opined that had Jiminez not arrived within ten minutes of when he did arrive and had not received proper treatment during surgery,

---

[5] On the night of the attack, Gerald Greland lived at 70 Hudson Avenue. (Greland: 671.) On October 24, 1998 at about 12:30 a.m. he heard noise coming from Front Street. (Greland: 672.) He saw two men across the street struggling. Id. The taller of the two turned the other around and struck him in the back. (Greland: 674.) Betancourt is six feet tall two inches. (Caban: 496-97.) Smith is slightly taller than Jiminez, who is five feet, eight inches tall. (Jiminez: 558.) The shorter man fell and lay on the ground. (Greland: 674-75.) Greland also saw a third man standing at the intersection of Hudson and Water Street. (Greland: 675.) This man said "Come on, let's go," went over to a gray four door car and got in behind the driver. (Greland: 675-77). The assailant then joined him in the car. (Greland: 677). Greland acknowledged that it was difficult to see what was happening because it was dark outside and his view was partially obstructed by the branches of a tree. (Greland: 673, 676).

4

he would have died (Brooks: 629.)[6]

Later that night Detective Anthony Caban interviewed Jiminez at the hospital. (Caban: 492.) Jiminez named Betancourt, Gonzalez, and Rosario. (Caban: 493.) He said there was also a fourth man whom he did not know. Id. The detective later learned that this was Smith. (Caban: 494.) Caban arrested Betancourt on October 31, 1998. (Caban: 495-96.)

Jiminez remained in the hospital for a week. The stabbing left him covered in scars. (Jiminez: 553.)

B. The Defense's Case

The defendant proposed to call Luis Ortiz, a witness who was allegedly going to testify that he saw Betancourt and Smith after the attack and that only Smith had blood on him. (Tr. 699-704.) The court granted the prosecutor's request to conduct a hearing pursuant to People v. Dawson, 50 N.Y.2d 311 (1980). After conducting the Dawson hearing, the court ruled that if Ortiz testified, the People would be permitted to question him about his failure to come forward on the defendant's behalf when the defendant was arrested. (Tr. 708-9.) The defendant rested without calling any witnesses. (Tr. 710-11.)

II. Subsequent Procedural History

Following a jury trial the Betancourt was convicted of Attempted Murder in the Second Degree (N.Y. Penal Law §§ 110.00, 125.25). (Tr. 817.) In accordance with the Court's instructions, upon finding Betancourt guilty of that charge, the jury did not reach any of the other counts submitted. (Tr. 787.) On September 14, 1999, Betancourt was sentenced to a determinate term of imprisonment of ten years (Sentencing Mins. at 8-9.)

---

[6] Upon his arrival at the hospital, Jiminez had a blood alcohol level of .12, a level which might have indicated that he was intoxicated. (Brooks: 628-29, 631-34.)

5

Betancourt appealed from his judgment of conviction. His assigned counsel filed a brief in the Appellate Division, Second Department, raising the argument that the prosecution failed to prove Betancourt's guilt beyond a reasonable doubt and the verdict was against the weight of the evidence. Betancourt also filed a pro se supplemental brief claiming, first, that the prosecution failed to preserve and disclose to him four items characterized as Brady material (see Brady v. Maryland, 373 U.S. 83 (1963)) and Rosario material (see People v. Rosario, 9 N.Y.2d 286, 213 N.Y.S.2d 448 (1961)), and, second, that errors in the court's charge to the jury deprived him of a fair trial.

By decision and order dated December 24, 2001, the Appellate Division affirmed Betancourt's judgment of conviction. People v. Betancourt, 289 A.D.2d 501 (N.Y. App. Div. 2001). The Appellate Division held that the defendant's guilt was supported by legally sufficient evidence and that the verdict was not against the weight of the evidence. The court held that Betancourt's remaining contentions from his pro se brief were "either unpreserved for appellate review or without merit."

By order dated February 6, 2002, Betancourt's initial application for leave to appeal to the New York Court of Appeals was denied. Betancourt's application for reconsideration was denied on May 24, 2002.

On March 27, 2003, having exhausted his claims in state court, Betancourt timely filed this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, claiming that (1) the prosecution failed to disclose certain exculpatory evidence as required under Brady; (2) his guilt was not proven beyond a reasonable doubt; and (3) errors in the court's charge to the jury

deprived him of a fair trial.[7]

Betancourt subsequently wrote a letter advising the Court of a new development in his case: his discovery of the fact that a witness for the prosecution may have given perjured testimony at trial. As this claim had not yet been raised in state court, the Court granted Betancourt an opportunity to stay the current petition pending exhaustion of his state court remedies on the claim. The Court also appointed counsel to advise Betancourt in connection with the issues raised by his correspondence, including whether the allegations contained therein should be addressed by this Court or the state court in which he was convicted. In a letter dated June 28, 2005, counsel advised the Court that Betancourt wished to withdraw his unexhausted claim and proceed with adjudication of the claims raised in his original petition.

## DISCUSSION

I. <u>Standard of Review</u>

Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a court's task on habeas review of claims that have been adjudicated on the merits in state court is limited by 28 U.S.C. § 2254(d), as follows:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

---

[7] Betancourt has dropped two state-law claims that he raised in the Appellate Division: his Rosario claim and his claim that the verdict was against the weight of the evidence under <u>People v. Bleakley</u>, 69 N.Y.2d 490 (N.Y. 1987).

28 U.S.C. § 2254(d).

A decision is "contrary to… clearly established Federal law" where the state court decision is "substantially different from the relevant precedent of [the U.S. Supreme] Court," or where the state court applies "a rule that contradicts the governing law set forth in [Supreme Court] cases." Williams v. Taylor, 529 U.S. 362, 405 (2000). The Second Circuit has interpreted Section 2254(d)(1) in light of Supreme Court precedent and held that "to permit habeas relief under the 'unreasonable application' phrase, a state court decision must be not only erroneous, but also unreasonable. Some increment of incorrectness beyond error is required." Francis S. v. Stone, 221 F.3d 100, 111 (2d Cir. 2000). The Second Circuit cautioned "that the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." Id. (internal citation and quotation marks omitted).

The Court will apply this deferential standard to all of the claims petitioner raised in his direct appeal. The Appellate Division decided them on the merits or deemed them "either unpreserved for appellate review or without merit." Under Jimenez v. United States, 458 F.3d 130, 146 (2d Cir. 2006), a state court decision using the above language is "on the merits for purposes of § 2254(d)." Accordingly, AEDPA deference applies.

II. Brady Claims

The prosecution in a criminal matter has a constitutional obligation to disclose exculpatory evidence to the defendant. See Brady v. Maryland, 373 U.S. 83 (1967), Giglio v. United States, 405 U.S. 150 (1972). In order to prevail on a Brady claim, a petitioner must demonstrate: 1) that there exists evidence that was not disclosed to him; 2) that the evidence was

8

favorable to him; and 3) the evidence was material. See Kyles v. Whitley, 514 U.S. 419, 437-38 (1995); United States v. Bagley, 473 U.S. 667, 682 (1985). Exculpatory evidence is considered material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Strickler v. Greene, 527 U.S. 263, 280 (1999) (quoting Bagley, 473 U.S. at 682). Nondisclosure merits relief only if the prosecution's failure "undermines confidence in the outcome of the trial." Kyles, 514 U.S. at 434 (quoting Bagley, 473 U.S. at 678) (internal quotations omitted).

The Supreme Court has rejected any distinction between impeachment evidence and exculpatory evidence. See Bagley, 473 U.S. at 676. Impeachment evidence "is 'evidence favorable to an accused,' Brady, 373 U.S. at 87, so that, if disclosed and used effectively, it may make the difference between conviction and acquittal." Id. The "individual prosecutor has a duty to learn of any favorable evidence known to others acting on the government's behalf in the case, including police." Kyles, 514 U.S. at 437.

Betancourt claims that certain impeachment material relating to prosecution witnesses Gerald Greland, William Flanagan, Julio Jiminez, and Ricardo Gonzalez was not disclosed to him, and that the cumulative effects of these non-disclosures undermines confidence in the verdict and deprives him of a fair trial.

A. Gerald Greland

Betancourt claims that there are two items that the prosecutor failed to disclose which pertain to Gerald Greland – an audiotape of an interview of Greland by an assistant district attorney and the audiotape of Greland's 911 call regarding the stabbing. (See Mem. of Law in Supp. of Pet.at 12-13, 17-18.)

The prosecution admitted that the audiotape of the interview was lost. In its stead, the government provided a verbatim transcript of the audiotape. Prior to trial, the government gave notice to defense of the existence of the 911 audiotape, however the tape was never copied. The parties disagreed about who was responsible for the tape's not having been copied. (Tr. 473-79.) At trial, outside the presence of the jury, the prosecutor played the 911 tape and the court ruled that because the tape had not previously been provided, the prosecution would not be allowed to use the tape. (Tr. 479-80.)

Betancourt contends that because Greland was a significant witness, the non-disclosed audio recordings may have made a difference in the determination of guilt, by providing jurors with the ability to hear Greland's account of the events and make a discriminating appraisal of his character. Betancourt speculates that the jury relied on Greland's account in weighing the determination of guilt and had the jury heard Greland's interview and 911 tape, Gonzalez's credibility would have seriously been undermined. In addition, Betancourt notes that there is nothing to establish that the transcription of the interview actually reflects the interview.

Betancourt's claim of non-disclosure with regard to the interview is meritless. A verbatim transcript of the interview was provided and therefore any information the prosecution obtained from Greland during the interview was fully disclosed. In addition, Betancourt has not identified how the information obtained by the prosecution during the interview was exculpatory. Moreover, given that he received a verbatim transcript of the interview,[8] Betancourt does not adequately show that he was prejudiced. Betancourt's belief that merely hearing Greland's voice will make a difference in the determination of guilt is far-fetched.

---

[8] Betancourt gives no reason to assume that the interview transcript he received is not a verbatim transcription.

With regard to the 911 audiotape, Betancourt does not have a persuasive argument that the prosecution withheld evidence from him. Indeed, after the tape was played Betancourt's counsel sought to have it excluded from evidence, and the court agreed to the counsel's request. (Tr. 479-80.) Betancourt has not adequately shown that the 911 audiotape was exculpatory. It seems obvious that if Greland's 911 call been exculpatory in any way, the prosecution would not have wanted to present it and Betancourt would not have sought to preclude it.

B. William Flanagan

Next, Betancourt asserts that the prosecution's non-disclosure of the 911 call made by William Flanagan violated Brady. (See Mem. of Law in Supp. of Pet. at 13-14, 19-20.) During trial, defense counsel proclaimed that this tape came as a "total shock and surprise." (Tr. 472.) Though the government disclosed the Sprint report detailing the names of individuals speaking on the 911 tapes, they did not specify Flanagan. (Tr. 477.) Having never reviewed the tape, Betancourt requested that the tape be excluded. (Tr. 473.) The Court, after listening to the tape, ruled that the call was inadmissable, since its introduction would constitute bolstering (Tr. 480), but should Betancourt's counsel open the door by cross-examining Flanagan based on a prior consistent statement the tape could come in (Tr. 481). Betancourt's counsel was willing to stipulate the time frame that Flanagan was alleged to have called the police so the jury did not hear the 911 tape. (Tr. 480-81.)

As Betancourt got the ruling that he requested – the preclusion of the tape – Betancourt cannot maintain that the prosecution withheld evidence from him. As with the Greland tape, although a copy was not turned over to the defense prior to the trial, the existence of the 911 tape was disclosed. Moreover, Betancourt does not specify in what respect Flanagan's 911 call is

exculpatory. Presumably, had the tape been exculpatory in any way, Betancourt's counsel would not have sought to preclude it. In addition, since the court found the tape would bolster Flanagan's testimony, Betancourt cannot show any kind of prejudice from the preclusion of the tape.

C. Julio Jiminez

Next, Betancourt asserts that the prosecution's non-disclosure of a 911 call allegedly made by the Julio Jiminez violated Brady. (See Mem. of Law in Supp. of Pet. at 15, 20.) The government, however, states that there was no such call, and therefore the lack of its disclosure cannot have violated Brady.

Mr. Laudadio, an Assistant District Attorney previously assigned to the case, created the confusion regarding a call by Jiminez because he told Betancourt a tape recording of Jiminez existed. (Tr. 472-73.) The government contends that if Mr. Laudadio informed defense that Jiminez had called 911, then Mr. Laudadio was obviously mistaken, because there is nothing in the trial record that suggests that the victim himself ever called the Police. (Aff. in Opp'n to Pet. at 17.) Betancourt believes that "given the spurious nature of the other Brady violations... it would hardly be surprising that there would exist a reference to Jiminez calling 911." (Mem. of Law in Supp. of Pet. at 20.) Betancourt further wishes the Court to consider an evidentiary hearing in order to explore the issue of an alleged 911 tape made by Jiminez and the prejudicial effect it would have on his right to a fair trial.

Nothing in the record suggests that Jiminez ever made any 911 call. Instead, the record indicates that William Flanagan observed Jiminez outside moaning for help, and he asked his wife to call 911. (Flanagan: 468-69.) Also, Gerald Greland, after seeing Jiminez fall to the

ground during the fight, called 911 after Jiminez asked him to. (Greland: 677-78.) Nor is there any reason to believe that trial counsel believed there was such a call. Counsel never sought any remedy for the non-production of the alleged 911 call. Counsel did not request that the prosecutor conduct a further investigation for the tape, did not request Jiminez's trial testimony to be delayed until the matter was resolved, nor for the judge to preclude Jiminez from testifying. Further, defense counsel did not even ask Jiminez whether he had called 911 during his cross-examination. No hearing is required.

   D.   Ricardo Gonzalez

Finally, Betancourt contends that the prosecution failed to disclose impeachment material regarding Ricardo Gonzalez. (Mem. of Law in Supp. of Pet. at 15-16, 20-21.)

Betancourt asserts that Gonzalez had made statements to the police or the District Attorney's Office even though the prosecution maintains that "nothing was memorialized in terms of any statements made by Mr. Gonzalez" and that there were "no notes" taken of any conversations with Gonzalez. (Tr. 396-97.) Before the trial began, the court instructed the prosecutor to undertake another search for any notes. (Tr. 399.) During that discussion, defense counsel agreed with the court that if the search did not turn up any notes, that would be "fair enough" – suggesting defense counsel was satisfied with the terms of the proposed search. (Tr. 399.) There is no further discussion in the record regarding notes of Gonzalez's alleged conversations. In fact, there is nothing in the record to suggest the existence of undisclosed statements by Gonzalez. Therefore, this Brady claim is without merit.

   E.   Summary of Brady Claims

In sum, Betancourt's Brady claims fail. Since Betancourt fails to allege, much less

demonstrate, how any undisclosed material was favorable to him, the Appellate Division reasonably applied federal law in rejecting his Brady claim. See U.S.C. § 2254(d)(1).

III. Proof Beyond Reasonable Doubt

In order for the Betancourt to prevail on a theory that there was insufficient evidence of his guilt, he must be able to show that, after viewing the evidence in the light most favorable to the prosecution, no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979). Petitioner "bears a very heavy burden" when challenging the legal sufficiency of the evidence in a state criminal conviction. Einaugler v. Supreme Court, 109 F.3d 836, 840 (2d Cir. 1997) (internal citation omitted); Knapp v. Leonardo, 46 F.3d 170, 178 (2d Cir. 1995). A habeas court must defer to the jury's assessments of the credibility of the witnesses and may not substitute its view of the evidence for that of the jury. See Maldonado v. Scully, 86 F.3d 32, 35 (2d Cir. 1996). Thus, under this "rigorous standard," a "federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume – even if it does not affirmatively appear in the record – that the trier of facts resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Wheel v. Robinson, 34 F.3d 60, 66 (2d Cir. 1994) (quoting Jackson, 443 U.S. at 326).

Jiminez's testimony revealed that when he, Gonzalez, and Smith got out of Rosario's car on Front Street, Smith started to curse Jiminez. In response, Jiminez pushed Smith, which led to Smith swinging a knife. When Jiminez jumped back out of the way, he felt himself being stabbed in the back. When he turned around, he found himself face to face with Betancourt, who was concealing something in his hand. When Jiminez asked Betancourt why he did this,

14

Betancourt did not deny his culpability. Jiminez turned back around to face Smith and the stabbing resumed, both to his front and back.

Betancourt asserts that this does not prove his guilt beyond a reasonable doubt because Jiminez did not actually see Betancourt holding a knife, nor did he actually see Betancourt stab him in the back. The inference that Betancourt stabbed Jiminez in the back is logical. Betancourt was directly behind Jiminez, was concealing an object in his hand, and did not deny his culpability. This is an acceptable inference to accept in light of the "rigorous standards" set forth in Jackson.

Gonzalez's testimony, furthermore, corroborates Jiminez's testimony. Gonzalez saw Betancourt leave Rosario's car and stab Jiminez from behind. Betancourt's attack on Gonzalez's credibility for testifying pursuant to a cooperation agreement is unpersuasive. The jury was aware of the circumstance under which Gonzalez testified and presumably concluded that the testimony was trustworthy. The Court must defer to jury's assessment of Gonzalez's credibility. Maldonado, 86 F.3d 32 at 35.

The testimonies of Jiminez and Gonzalez are sufficient to sustain the jury's finding that Betancourt was guilty of attempted murder. Betancourt's claim that his guilt was not proven beyond a reasonable doubt fails. The Appellate Division reasonably applied federal law in rejecting this claim. See U.S.C. § 2254(d)(1).

IV. Error in Jury Instructions

"In order to obtain a writ of habeas corpus in federal court on the ground of error in a state court's instructions to the jury on matters of state law, the petitioner must show not only that the instruction misstated state law but also that the error violated a right guaranteed to him

15

by a federal law." Davis v. Strack, 270 F.3d 111, 123 (2d Cir. 2001) (quoting Casillas v. Scully, 769 F.2d 60, 63 (2d Cir. 1985)). In weighing the prejudice from an allegedly improper charge, a reviewing court must view the instruction in the context of the entire charge. DelValle v. Armstrong, 306 F.3d 1197, 1201 (2d Cir. 2002) (quoting Cupp v. Naughten, 414 U.S. 141, 146-47 (1973)). The question is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." Cupp, 414 U.S. at 147.

Betancourt first contends that he was deprived of a fair trial by the court's failure to advise the jury that Ricardo Gonzalez was an accomplice whose testimony required corroboration. A petition for a writ of habeas corpus, however, may only be issued to a state prisoner upon the ground that the prisoner is in custody "in violation of the Constitution or laws or treaties of the United States..." 28 U.S.C. § 2254(a). "A federal court may not issue the writ on the basis of a perceived error of state law." Pulley v. Harris, 465 U.S. 37, 41 (1984); see also Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) ("it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions"); Dunnigan v. Keane, 137 F.3d 117, 125 (2d Cir. 1998). A claim that the government failed to satisfy New York's accomplice corroboration rule "is based on state law." Gaiter v. Lord, 917 F. Supp. 145, 150 (E.D.N.Y 1996). Therefore, Betancourt's claim that the court erred by not instructing the jury on accomplice corroboration, is not cognizable in a petition for a writ of habeas corpus. Id. at 150.

Betancourt additionally contends that some of the court's instructions on proof beyond a reasonable doubt and the presumption of innocence deprived him of a fair trial. Betancourt asserts that the trial court's jury instructions improperly conveyed to the jury a lesser standard than that which is required to convict. He argues that by telling the jury that it could speculate as

to the defendant's motive but could not speculate to find reasonable doubt, the court confused the jury. His claims are not supported by the record. The judge's charge on reasonable doubt and motive correctly stated the law.

To the extent defendant argues that he did not get a charge on mere presence, that claim is false. The judge charged the jury that "[i]t is not sufficient if the prosecution merely establishes that the accused and the others were associated with one another, or that the accused was merely present when the others engaged in the conduct." (Tr. 775.) Thus, the acting in concert charge was proper.

Thus, the Appellate Division reasonably applied federal law in rejecting this claim. See U.S.C. § 2254(d)(1).[9]

## CONCLUSION

For the reasons set forth above, Betancourt's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is denied. A certificate of appealability will not issue because petitioner has not made a substantial showing of the denial of a constitutional right. See 28 U.S.C. § 2253 (c)(2). The Clerk of the Court is directed to enter judgment in accordance with this Order and to close the case.

SO ORDERED.

Dated: Brooklyn, New York
September 29, 2005

Carol Bagley Amon
United States District Judge

---

[9] Because petitioner's argument is so weak on the merits, the Court need not address the procedural problem that his counsel never objected to the charge as read. (Tr. 793.)

17